Judgment rendered January 12, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,124-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                              Appellee

versus

TRAVIS JACKSON                                  Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 350,212

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Douglas Lee Harville

JAMES E. STEWART, SR.                   Counsel for Appellee
District Attorney

RON CHRISTOPHER STAMPS
BRITNEY A. GREEN
SENAE DENEAL HALL
REBECCA A. EDWARDS
Assistant District Attorneys

* * * * *

Before PITMAN, STONE, and ROBINSON, JJ.

**PITMAN, J**.

A jury found Defendant Travis Jackson guilty as charged of second degree murder, and the trial court sentenced him to life imprisonment at hard labor without benefits. Defendant appeals. For the following reasons, we affirm Defendant's conviction and sentence.

## FACTS

On August 15, 2017, a grand jury charged that on or about June 19, 2017, Defendant committed the second degree murder of Edward Lawrence.

Jury selection was conducted on September 28 and 29, 2020. Evidence was adduced on September 30 and October 1, 2020. Defendant represented himself at trial and had a public defender as standby counsel.

Vickie Ashley, Lawrence's sister, testified about his dependable role in their family but noted that he had a history of substance abuse.

Kiersten Tate, a family friend of Lawrence, testified that on June 19, 2017, she was in the driveway of his house on West 80th Street in Shreveport while they changed the tires on her vehicle. It was her understanding that Defendant and his girlfriend Katie Russell stayed at Lawrence's house the night before. She overheard Russell and Lawrence having a conversation that was "a little hostile, but [not] physical" over $20 that Defendant owed Lawrence. Tate stated that when Defendant arrived at the house, he and Lawrence "got into it" over the $20 debt. The conversation escalated and Lawrence, who was holding a pole from the floor jack, stated that he was 76 years old and was not going to fight Defendant and then threw the pole on the ground and went into the house and closed the front door. She noted that the pole did not hit Defendant. She testified that Defendant pulled out a pistol from his waist and shot twice through the

side of the house and then approached the front door and shot twice through the front door. As Defendant approached the front door, Tate came up behind him and wrapped her arms around him to try to stop him, but was unsuccessful. She saw Lawrence bleeding on the floor and noted that he had been shot, was choking on blood and appeared to be dying. She then jumped on Russell, and they began fighting. Defendant pulled the pistol on her, and they stopped fighting. Russell and Defendant then drove away in his vehicle. Tate called 911. She stated that she spoke to law enforcement at the scene and at the police station. She identified Defendant and Russell in photographic lineups and identified Defendant in the courtroom. She testified that she never heard Lawrence make any threats toward Defendant and did not observe him approach Defendant in an aggressive manner. On cross-examination, she noted that the $20 debt was for "dope" that Lawrence "fronted" Defendant the previous day.

Michael Adams testified that on June 19, 2017, he witnessed the altercation between Defendant and Lawrence. He recalled that Lawrence was working on a vehicle in the driveway when Defendant arrived. He overheard them talking about Russell and a $20 debt and noted that Defendant was hostile and trying to pick a fight with Lawrence. He saw Defendant pull a weapon from his waistband. Adams then ran to the other side of the house and saw Lawrence run inside the house. He heard four gunshots followed by women screaming and then observed Defendant drive away. Adams stated that Lawrence was lying on the living room floor with a gunshot wound to the chest. He later identified Defendant and Russell in photographic lineups and identified Defendant in the courtroom. On cross-examination, he added that Lawrence asked Defendant to leave him alone

2

and then threw a jack handle on the ground out of frustration when Defendant would not leave. He stated that Lawrence did not throw the pole at Defendant and noted that Defendant was standing behind Lawrence.

Sergeant Darryl Coney of the Shreveport Police Department testified that in June 2017, he was dispatched to a shooting on West 80th Street. When he arrived at the scene, he met Tate, who told him that Defendant shot Lawrence in an argument over $20. He recounted Tate's statement of the events, which was consistent with her testimony at trial. He also made contact with Adams, who overheard the argument and subsequent gunshots. He testified that the witnesses were then transported separately to the police station for interviews.

Corporal Eric Powell of the Shreveport Police Department testified that on June 19, 2017, he responded to a call of a shooting on West 80th Street. The witnesses at the scene gave him a description of the shooter, the vehicle he was driving and the passenger in the vehicle. He observed an unresponsive Lawrence lying on the living room floor with a large amount of blood on the ground around him. While the fire department tended to Lawrence, Powell cleared the house. The next day, he overheard a call on the police radio regarding a sighting of a homicide suspect. He arrived as other officers were initiating a traffic stop. Once the occupants of the vehicle were taken into custody, they determined that Defendant was the passenger and his brother Daniel Jackson was the driver. He identified Defendant in the courtroom.

Daniel Jackson testified that on June 19, 2017, Defendant called him and asked him to pick him up in Keithville. He complied, and Defendant eventually told him that he was accused of shooting someone. He

3

encouraged Defendant to turn himself in, and they attempted to contact their brother who worked for the Shreveport Police Department. He testified that on June 20, 2017, he was driving with Defendant in the vehicle, and when they came up to a red light, they were apprehended by law enforcement.

Officer John Madjerick of the Shreveport Police Department testified that on June 19, 2017, he responded to the house on West 80th Street to investigate the crime scene. He photographed the scene and described photographs that were shown to the jury. He collected expended 9-millimeter cartridge casings and projectile fragments from the scene. He described photographs that showed the path of the projectile as it passed through the door. He discussed the impact that an intermediate target, i.e., the front door, might have on the path of a bullet and on the shape of the entry wound to a subsequent target, i.e., Lawrence. He also accompanied detectives to the possible location of the firearm used in the shooting and photographed the scene. He stated that they recovered a Glock model 17 9-millimeter handgun that was loaded with a live round. He stated that the firearm was submitted for review by a firearm examiner.

Detective Jonathan Varnell of the Shreveport Police Department testified that on June 19, 2017, he responded to the scene of the shooting and spoke to several witnesses there and at the police station. He noted that the witnesses were transported to the police station in separate cars, placed in separate offices at the station and interviewed individually. His account of Tate's statement was consistent with her testimony at trial. He stated that Tate and Adams correctly identified Defendant and Russell in photographic lineups. He also spoke with Daniel Jackson, who explained that Defendant told him that he thought he killed someone and that they were on their way

4

to the police station so Defendant could turn himself in when their vehicle was stopped by law enforcement. On June 20, 2017, Det. Varnell spoke with Defendant, who told him that he had an interview at the time of the shooting and that he could not be in two places at once. Defendant stated that he heard there had been a scuffle and supposed he would have scratches on him if he had been involved. The recorded interview was played. Det. Varnell noted there were inconsistencies in Defendant's timeline of events but that he consistently denied being at the scene at the time of the shooting. Det. Varnell testified that Russell assisted law enforcement in locating the weapon used in this case. She directed detectives to a remote location in southern Caddo Parish, and they recovered a 9-milimeter Glock. On cross-examination, he stated that Tate told him that Lawrence swung a pole at Defendant after Defendant lunged at him and that Adams told him that Lawrence swung a pole at Defendant before throwing it on the ground.

Richard Beighley, who was accepted as an expert in firearm identification, testified that he analyzed evidence in this case that was submitted to the Northwest Louisiana Crime Lab. He determined that three 9-millimeter cartridge cases that were recovered from the scene were fired from the 9-millimeter Glock. He noted that bullet jacket fragments from the scene were too damaged to determine if they were fired from the 9-millimeter Glock. He stated that he could not make a positive identification that a projectile recovered from Lawrence was fired by the 9-millimeter Glock, but he noted that it had the same class characteristics and came from a 9-millimeter Glock-type weapon.

Dr. Long Jin, a forensic pathologist, testified that he performed the autopsy on Lawrence on June 20, 2017. Photographs he took during the

autopsy were published to the jury. He described a photograph as showing a gunshot wound to the upper chest with a probe present to identify the direction of the projectile. He described the entry wound as irregular in shape and that the bullet may have gone through an intermediate target like a door with fragments then going into the body. He opined that the gunshot wound to the chest was the cause of Lawrence's death. Dr. Jin testified that the toxicology report showed a "very high level" of methamphetamine in Lawrence's blood.

The state rested its case, and Defendant chose not to testify. In his closing argument, Defendant stated that Lawrence swung a pole at him, that the events were a "tragic accident," that a reasonable jury should not believe that he intended to harm or kill Lawrence and that he acted in self-defense.

On October 1, 2020, a unanimous jury found Defendant guilty as charged of second degree murder.

Defendant filed pro se motions for post-verdict judgment of acquittal and a new trial. The trial court denied both motions.

On November 9, 2020, the trial court sentenced Defendant to the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. It stated that the sentence was to run concurrently with any other sentence and gave him credit for time served.

Defendant appeals and is represented by counsel on appeal.

**DISCUSSION**

Defendant argues that the state presented insufficient evidence to prove beyond a reasonable doubt that he was guilty of second degree murder. He contends that the evidence establishes that he was not guilty or

6

that he was guilty of manslaughter.  He states that the evidence shows that Lawrence was high on methamphetamine and acting violently when he struck Defendant with a metal pipe during an argument over a drug debt. Defendant contends that when Lawrence went inside his house, he did not know if Lawrence was retreating or arming himself.  He asserts that the evidence presented by the state was insufficient to negate his self-defense claim; and, therefore, his conviction should be reversed, his sentence vacated and a judgment of acquittal entered.  In the alternative, he argues that he acted in a sudden passion or heat of blood caused by Lawrence's actions; and, at worst, he should be convicted of manslaughter, and the matter should be remanded for resentencing.

The state argues that the evidence presented at trial proved beyond a reasonable doubt that Defendant was guilty of second degree murder.  It contends that Defendant was the aggressor and that there was no evidence that Lawrence's use of methamphetamine affected his behavior.  It notes that although Lawrence might have swung a pole, he did not attack or hit Defendant with it.  It states that Defendant drew a weapon, pursued Lawrence and fired multiple times into Lawrence's house.  It contends that these actions show that Defendant had a specific intent to kill or inflict great bodily harm on Lawrence.  It also argues that the evidence proved beyond a reasonable doubt that Defendant did not commit the homicide in self-defense.  It further contends that there was no provocation sufficient to deprive an average person of self-control and cool reflection that would support a lesser verdict of manslaughter.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to

/

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Smith*, 47,983 (La. App. 2 Cir. 5/15/13), 116 So. 3d 884. *See also* La. C. Cr. P. art. 821. When a defendant challenges the sufficiency of the evidence in a self-defense case involving a homicide, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Stockstill*, 19-01235 (La. 10/20/20), 2020 WL 6145223, *citing State v. Matthews*, 464 So. 2d 298 (La. 1985).

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. *Id.* The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03) 858 So. 2d 422.

La. R.S. 14:30.1 provides, in pertinent part, that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). When justification is raised by the defendant, the state must prove beyond a reasonable doubt that the crime was not committed in self-defense. *State v. Burton*, 19-01079 (La. 6/30/21), 320 So. 3d 1117, *citing State v. Matthews*, *supra*.

> La. R.S. 14:31(A)(1) states that manslaughter is:
>
> A homicide which would be murder under . . . Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

A defendant who claims provocation as a means of reducing murder to manslaughter bears the burden of proving these elements by a preponderance of the evidence. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196, *writ denied*, 19-00761 (La. 11/19/19), 282 So. 3d 1066. Provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *Id*., *citing State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1979, 167 L. Ed. 2d 100 (2007).

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the state proved the essential elements of second degree murder. The state presented sufficient evidence to prove that Defendant killed Lawrence when he had a specific intent to kill or to inflict great bodily harm. Tate's

9

testimony of Defendant's actions of drawing his gun and shooting it four times into the house Lawrence just entered showed Defendant's intent.

Defendant's shooting and killing of Lawrence was not justifiable, and the state proved beyond a reasonable doubt that the homicide was not committed in self-defense. The jury assessed the credibility of the witnesses and determined that the testimony presented at trial, including testimony of Lawrence's drug use, showed that Defendant was the aggressor and was not acting in self-defense when he shot and killed Lawrence. Tate's testimony detailed the argument between Defendant and Lawrence explaining that after Lawrence announced he would not fight Defendant, he threw a pole on the ground and retreated into his house. Defendant then drew his pistol and shot into Lawrence's house. Similarly, Adams testified that Defendant was the hostile party and tried to provoke a fight with Lawrence before drawing a gun from his waistband. At trial, both Tate and Adams testified that Lawrence did not throw the pole at Defendant; however, Det. Varnell testified that in their statements on the day of the shooting, they told him that Lawrence did swing a pole at Defendant before throwing it on the ground. Det. Varnell noted that Tate stated that Defendant lunged at Lawrence before Lawrence swung the pole. Although Lawrence and Defendant engaged in a verbal argument and Lawrence held and then threw a pole before retreating into his house, these actions do not make Defendant's action of shooting a gun into Lawrence's house reasonable. Under these circumstances, it was not reasonable for Defendant to believe that he was in imminent danger of losing his life or receiving great bodily harm and that the killing of Lawrence was necessary to save himself from that danger.

10

Defendant's alternate argument that he should have been convicted of the lesser offense of manslaughter is also without merit. Defendant did not meet his burden of proving that he committed the homicide in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. The jury acted reasonably and within its discretion by finding Defendant guilty as charged rather than guilty of manslaughter.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of Defendant Travis Jackson.

**AFFIRMED.**